**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

FOURTHANE ENGINEERING AND
SERVICES LIMITADA, and                                    Case No.
FOURT INDUSTRIAL SUPPLIES, INC.,

     Plaintiffs,

v.

MICHAEL TUCKER, DANIEL MARTIN, WILL
EVANS, and INTEGRITY INNOVATIONS GROUP
LLC d/b/a TEAM INNOVATIVE SOLUTIONS,

     Defendants.

_____/

## COMPLAINT

     Plaintiffs Fourthane Engineering and Services Limitada (*"Fourthane"*) and Fourt Industrial Supplies, Inc. (*"FIS,"* with Fourthane, *"Fourt"* or *"Plaintiffs"*), sue defendants Michael Tucker, Daniel Martin, Will Evans, and Integrity Innovations Group LLC d/b/a TEAM Innovative Solutions (*"IIG,"* together, *"Defendants"*), and allege:

## NATURE OF THE ACTION

1.     This action arises from the coordinated departure of three key employees who used their positions of trust to misappropriate Fourt's trade secrets and confidential information, breach their contractual and fiduciary duties, and launch a directly competing business that markets copycat products to Fourt's customers.

2.     Fourt designs, manufactures, and sells industrial polyurethane wear and lining products for mining and heavy industry, including the products it markets under the Fourthane name. Fourt has operated since 1996 and sells its products in more than 50 countries, including through FIS, its United States subsidiary. Fourt's competitive position depends on confidential and

1

trade secret information, including its product formulations, manufacturing and application processes, customer lists and account information, pricing, and supplier sourcing.

3.     Defendant Michael Tucker served as FIS's General Manager for approximately twelve years, from January 29, 2014 to April 30, 2026. Defendant Daniel Martin served as FIS's Operations Manager. Defendant Will Evans served as FIS's sales representative for a territory that included Florida. Each had access to Fourt's trade secrets and confidential information, and each owed Fourt duties of loyalty. Tucker and Evans also signed written employment agreements containing confidentiality and restrictive covenants.

4.     While still employed and entrusted with Fourt's confidential information, Tucker and Martin began positioning a competing venture, including by organizing a competing company. Tucker's and Martin's resignations were effective May 1, 2026, and Evans resigned on May 17, 2026. Tucker and Martin formed and registered Defendant IIG, which does business as TEAM Innovative Solutions and which markets products that compete directly with Fourt's, including a product presented to a Fourt customer as a replacement for Fourt's flagship line.

5.     Defendants have caused, and unless enjoined will continue to cause, irreparable harm to Fourt, including the loss of customers and goodwill. Fourt brings claims for misappropriation of trade secrets under federal and Florida law, breach of contract, breach of fiduciary duty, tortious interference with business relationships, and civil conspiracy, and seeks injunctive relief, damages, exemplary damages, disgorgement, and its attorneys' fees and costs.

## THE PARTIES

6.     Plaintiff Fourthane is a limited liability company organized under the laws of Chile, with its principal place of business in Santiago, Chile. Fourthane is the parent of FIS and developed and owns the technology behind the industrial polyurethane wear and lining products at issue.

2

7.      Plaintiff FIS is a Nevada corporation with its principal place of business in Sunrise, Florida. It was originally organized as a Nevada limited liability company, Fourt Industrial Supplies, LLC, and converted into a Nevada corporation under the name FIS pursuant to Nevada Revised Statutes § 92A.205 in 2014. Through FIS, Fourt conducts and directs its United States operations from Florida, where it opened a Florida office on August 1, 2024.

8.      Defendant Michael Tucker is an individual who resides in Pembroke, Georgia. During his employment, Tucker worked from FIS's office in Tempe, Arizona. Tucker was employed by Fourt from January 29, 2014 to April 30, 2026, most recently as its General Manager for North America. As part of his work for Fourt, Tucker repeatedly visited FIS's Florida office. Upon information and belief, Tucker is a member and organizer of defendant IIG.

9.      Defendant Daniel Martin is an individual who resides in Phoenix, Arizona. Martin was employed by FIS as its Operations Manager from August 23, 2021 until his resignation, which was effective May 1, 2026, approximately four years and eight months. Martin reported to Tucker and visited FIS's Florida as part of his job for FIS. Martin is the statutory agent of defendant IIG, and the LLC's Arizona articles list his Phoenix residence as the statutory agent's address.

10.     Defendant Will Evans is an individual who resides in Florida. Evans was employed by FIS as a sales representative whose territory included Florida, until his resignation on May 17, 2026. Evans reported to Tucker. Evans is now working for IIG, in violation of his duties to Fourt.

11.     Defendant IIG was first organized by Tucker as a Georgia limited liability company on April 13, 2026 (Georgia Control No. 26088098), while Tucker, Martin, and Evans were still employed by FIS, and was then registered or organized in Arizona on May 15, 2026 (Arizona Business ID 25064945). Tucker is its sole listed member and organizer, and Martin is its statutory

3

agent. IIG's stated character of business is industrial belting wholesale, which is Fourt's line of business.

### JURISDICTION AND VENUE

12.     This Court has subject matter jurisdiction under 28 U.S.C. § 1331 and 18 U.S.C. § 1836(c) because Fourt asserts a claim under the Defend Trade Secrets Act, 18 U.S.C. § 1836 *et seq*. The trade secrets at issue relate to products and services used in, and intended for use in, interstate and foreign commerce.

13.     This Court has supplemental jurisdiction under 28 U.S.C. § 1367 over Fourt's state-law claims because those claims form part of the same case or controversy as the federal claim and arise from a common nucleus of operative fact.

14.     This Court has personal jurisdiction over each Defendant under Florida's long-arm statute, Fla. Stat. § 48.193, and consistent with constitutional due process, for the following reasons, among others:

15.     *Tortious acts within Florida*. The individual Defendants committed tortious acts within Florida under Fla. Stat. § 48.193(1)(a)(2). Evans resides in Florida, serviced a sales territory that included Florida, and visited FIS's Florida office and dealt directly with its Florida-based team. After FIS's Florida office opened in August 2024, Tucker and Martin reported to FIS's chief executive in Florida and communicated frequently with the Florida office on operational matters, including shipments, inventory, and order coordination. Although Tucker and Martin worked from Arizona, they directed their conduct into Florida and aimed their misappropriation of Fourt's Trade Secrets, their breaches of the duties of loyalty owed to a Florida-based employer, and their interference with FIS's customer relationships at Florida, where FIS feels the resulting injury. Both traveled to Florida as part of their employment with Fourt.

16.     *Business in Florida*. The individual Defendants operated, conducted, engaged in, or carried on a business or business venture in Florida under Fla. Stat. § 48.193(1)(a)(1) through their long-term and continuing relationships with Fourt's Florida-based operations and through the Defendants' competing venture, which upon information and belief has solicited and transacted business affecting Florida, including employing Evans, a Florida-based employee, as well as upon information and belief soliciting Florida-based customers. .

17.     *Breach of contract performed in Florida*. Tucker's and Evans's employment agreements required acts to be performed in Florida, and each breached those agreements in Florida under Fla. Stat. § 48.193(1)(a)(7).

18.     *Conspiracy jurisdiction*. Each Defendant is subject to jurisdiction under the co-conspirator theory of Fla. Stat. § 48.193(1)(a)(2). Defendants agreed to commit tortious acts against Fourt, and at least one Florida-based co-conspirator committed tortious acts in furtherance of the conspiracy in Florida, including the solicitation of FIS's customers and the misappropriation and use of Fourt's confidential information directed at Florida. This basis reaches IIG, Tucker, and Martin, through the Florida acts of their co-conspirators.

19.     *Due process*. The exercise of jurisdiction comports with due process because each Defendant purposefully directed conduct at Florida, the claims arise from those Florida contacts, and the Defendants knew that the brunt of the resulting harm would be felt by FIS in Florida. The Defendants' contacts are with Florida itself, and not merely with a plaintiff that happens to reside in Florida.

20.     Defendant IIG is subject to jurisdiction through the Florida-directed conduct of its members and agents acting on its behalf, through the co-conspirator theory, and upon information and belief through its own solicitation of business affecting Florida.

21.     Venue is proper in this District under 28 U.S.C. § 1391(b)(2) because a substantial part of the events giving rise to the claims occurred in this District, and a substantial part of the harm was suffered in this District.

## FACTUAL ALLEGATIONS

### A.     Fourt's Business and Its Trade Secrets

22.     Fourt designs, manufactures, and sells industrial polyurethane and polymer wear and lining products used in mining and heavy industry, including the products it markets under the Fourthane name. Fourt sells these products throughout the United States and internationally, and it conducts and directs its United States operations from Florida through FIS.

23.     Fourt competes on the strength of confidential and proprietary information that it has developed and refined over many years, including, without limitation: (a) the chemical formulations of its polyurethane and polymer wear and lining compounds, including the Fourthane line; (b) its manufacturing processes and its application and installation procedures; (c) its customer information, customer lists, account contacts, purchasing histories, and customer requirements, including for the Florida territory; (d) its pricing structures, margins, and bid strategies; and (e) its supplier and raw material sourcing information (collectively, the *"Trade Secrets"*).

24.     Fourthane and FIS own the Trade Secrets. Fourthane developed and owns the chemical formulations, manufacturing processes, technical specifications, and related know-how. Fourthane authorized FIS to use that technology to manufacture Fourthane products in the United States under a written manufacturing agreement. FIS developed and owns the United States commercial and operational information, including customer information and contacts, sales history, pricing, costs, margins, forecasts, commercial strategies, inventory information, and supplier relationships.

6

25.     The Trade Secrets derive independent economic value, actual and potential, from not being generally known to, and not being readily ascertainable through proper means by, competitors and others who could obtain economic value from their disclosure or use. A competitor could not replicate Fourt's formulations, processes, customer relationships, and pricing without years of independent effort or improper access to Fourt's confidential information, if ever.

26.     Fourt takes reasonable measures to protect the secrecy of the Trade Secrets. For example, the product formulations are only known by a very limited number of key employees. Fourthane licenses the formulations to FIS under a written manufacturing agreement that restricts their use and does not transfer ownership. Fourt maintains confidentiality and nondisclosure agreements with suppliers, and Fourt requires confidentiality commitments from key employees, including the covenants in the Tucker Agreement and the Evans Agreement. Fourt also employs password and network-level IT protections to the Trade Secrets.

**B.     The Individual Defendants Held Positions of Trust and Had Access to the Trade Secrets**

27.     Tucker served as FIS's General Manager for approximately twelve years. Tucker had broad and continuing access to Fourt's Trade Secrets, including proprietary formulas and processes, the entire customer base and customer contacts, pricing and margin information, and supplier information, raw material and ingredient information. He controlled FIS's product inventory and shipments. Tucker also held responsibility for sales, customer development, logistics, recordkeeping, and personnel, and he was among the most trusted employees at FIS.

28.     Tucker's access to Fourt's formulations was direct and deliberate. At a meeting at FIS's Florida office, Tucker asked FIS leadership to enter Fourt's product formulations into FIS's QuickBooks system, telling them it was "for inventory purposes." Tucker's request confirms that

he knew of, valued, and had access to Fourt's proprietary formulations, which are among the most closely guarded of the Trade Secrets.

29.     Martin served as FIS Operations Manager. In that role, Martin had access to Fourt's operational Trade Secrets, including logistics, inventory, shipping, pricing, cost, supplier, and customer information.

30.     Evans served as a FIS sales representative whose territory included Florida. In that role, Evans had access to Trade Secrets including FIS's customer relationships and information, account contacts, customer requirements, and pricing, including for the Florida territory.

31.     Because of their senior and trusted positions, Tucker, Martin, and Evans each owed Fourt a duty of loyalty and a fiduciary duty to act in Fourt's interests, not to use their positions or Fourt's confidential information to compete against Fourt, and not to use, disclose, or misappropriate the Trade Secrets, confidential information, know-how, and other proprietary information for their own benefit.

32.     Tucker also undertook written contractual obligations. On or about January 29, 2014, Tucker signed a written employment agreement (the *"Tucker Agreement"*). A copy is attached as **Exhibit "A."** Under the Tucker Agreement, for one year following the end of his employment, Tucker agreed not to solicit, directly or indirectly, the business of any FIS client or customer for his own benefit or that of any third person or organization, and not to induce, directly or indirectly, any FIS employee to leave FIS. Tucker also agreed not to disclose financial information relating to FIS or its affiliates or clients, and agreed to maintain the confidentiality of Fourt's confidential information during and after his employment.

33.     Evans also undertook written contractual obligations. On or about October 9, 2023, Evans signed a written employment agreement with FIS (the *"Evans Agreement"*), which Tucker

signed for the Company. A copy is attached as **Exhibit "B."** Under the Evans Agreement, Evans agreed to an eighteen-month restricted period and to covenants that include a covenant not to compete, a covenant not to solicit FIS's customers and suppliers, a covenant not to recruit FIS's employees, a perpetual confidentiality covenant, and a non-disparagement covenant. Evans stipulated that a breach would cause irreparable harm warranting injunctive relief.

### C.     Tucker and Martin Began Competing Against Fourt While Still Employed

34.     Tucker and Martin's disloyalty began long before they resigned. On or about July 9, 2024, while still employed by FIS and drawing his salary and commissions, Tucker and Martin arranged to ship Fourt's finished products, using FIS's own United Parcel Service account, to Forsch Polymer Corporation, a developer of similar polymer products, at 3025 South Wyandot Street, Englewood, Colorado, upon information and belief for the purpose of developing copies or backup products. The shipment was sent under Tucker's name, Martin created the UPS label from his FIS email account, and the package contained three Red 85 and three Red 92 repair kits. The Red 85 and Red 92 systems are among Fourt's flagship proprietary polymer repair products and among its most important products in the United States market, and they have been central to Fourt's conveyor belt repair business, brand recognition, and commercial success for many years. It was delivered on July 12, 2024, to a recipient identified only as Dole. Tucker and Martin did not request authorization from FIS for this shipment and did not disclose or report it, and sent the shipment without the knowledge or approval of Fourt management.

35.     Upon information and belief, Tucker and Martin arranged the shipment for the benefit of a competing venture and against the interests of FIS, the employer they were duty-bound to serve. That they did so nearly two years before their resignation shows that the competing venture was conceived and underway long before their departures and was not legitimate post-employment competition.

36.     Tucker concealed this conduct. The email reflecting the shipment was recovered from the Trash folder of Tucker's FIS email account, reflecting an effort to hide it. Tucker also acted to conceal his competing activities after he resigned: on or about May 17, 2026, he blocked Fourt and its personnel on LinkedIn so that they could not view his posts, and he then began publicly promoting TEAM Innovative Solutions.

37.     While still employed, Tucker took additional disloyal acts using Fourt's systems. On March 18, 2026, Tucker exported Fourt's contacts from his Fourt account, exporting 4,535 contacts and a further 124 contacts. In April 2026, Tucker shared Fourt's confidential business records externally, including a document titled PRICE Worksheet 2026, a SPLICE MATERIAL PRICE CALCULATOR, a MiCS SALES SCHEDULE, a Fourt product presentation, and a Fourt company folder. On April 7, 2026, Tucker deleted numerous Fourt company documents from Fourt's systems, including corporate records, a statement of the nature of the business, and a balance sheet. On April 24, 2026, Tucker deleted a contact. Upon information and belief, Tucker, Martin, and Evans took further disloyal acts while employed, including accessing, exporting, or retaining Fourt's customer information and pricing for use in the competing venture and coordinating with one another in advance of their departures.

**D.     Tucker, Martin, and Evans Resigned in a Coordinated Departure**

38.     Tucker organized the competing company on April 13, 2026, the same day Martin submitted his written resignation and Tucker gave notice of his own. On April 21, 2026, Tucker announced his resignation to the entire FIS team. Tucker's and Martin's resignations were effective May 1, 2026. Evans resigned on May 17, 2026, effective immediately.

39.     The departures of the three employees who together held Fourt's most sensitive knowledge of its operations and customers, in close succession and alongside the formation of a competing company, reflect a concerted plan to leave Fourt and compete against it. Martin reported

to Tucker, submitted his resignation to Tucker, and became the statutory agent of Tucker's competing company. As General Manager, Tucker was bound by the anti-raiding covenant in the Tucker Agreement, and Tucker induced or participated in inducing Martin and Evans to leave Fourt for the competing venture.

### E.      Defendants Formed a Competing Company and Marketed Copycat Products

40.      Tucker organized IIG as a Georgia limited liability company on April 13, 2026, while he and Martin were still employed by Fourt, naming himself as organizer, registered agent, and sole member. On May 15, 2026, the entity was registered or organized in Arizona as Integrity Innovations Group (dba Team Innovative Solutions) LLC, with Tucker as member and organizer and Martin as the statutory agent, using Martin's Phoenix residence as the registered address.

41.      TEAM Innovative Solutions markets products that compete directly with Fourt's products and serve the same industrial applications Fourt serves, including conveyor belt repair and abrasion and corrosion lining for equipment such as cyclones, tanks, and classifiers. Tucker publicly holds himself out as the owner of TEAM Innovative Solutions, and he emphasizes his chemical training and his focus on wear and lining compounds, which are the very subjects of Fourt's Trade Secrets. TEAM Innovative Solutions also adopts language and marketing themes closely similar to Fourt's United States branding, including a slogan used by Fourt in the United States, which shows that TEAM Innovative Solutions is intentionally positioning itself by trading on the reputation, expertise, and goodwill associated with Fourt and its proprietary technology rather than operating as an independent competitor.

42.      Recently Tucker and TEAM Innovative Solutions published a post on LinkedIn promoting TEAM Innovative Solutions to customers. Tucker stated that his team had been supporting customers "for years," and he promoted that TEAM Innovative Solutions now manufactures "Made in USA" products. By promoting TEAM Innovative Solutions to the

customers his team has "supported for years," Tucker admits that he is soliciting the very customers he served during his years at FIS. TEAM Innovative Solutions did not exist until 2026, so the customers his team supported "for years" can only be FIS's. That Tucker now offers those same customers the same products for the same applications confirms that TEAM Innovative Solutions competes directly with Fourt. Tucker's promotion of TEAM Innovative Solutions as a manufacturer of its own products, so soon after his departure, further shows that Defendants relied on Fourt's misappropriated formulations and manufacturing processes rather than developing their own.

43.     Evans is associated with TEAM Innovative Solutions, including as an independent contractor.

**F.     Defendants Used and Disclosed Fourt's Trade Secrets and Solicited Fourt's Customers**

44.     On May 1, 2026, before his resignation, Evans forwarded Fourt customer lists from his Fourt email account to his personal email account. The lists identified Fourt's customers and their locations, including Fourt's Florida customers, and constitute Trade Secrets. The transmission outside Fourt's systems was an unauthorized disclosure of Fourt's confidential information for use in the competing venture, and the emails were later recovered from the Trash folder of Evans's Fourt email account.

45.     Within weeks of his resignation, Tucker presented a new competing product to QBM, a Fourt customer and distributor account, and QBM arranged a presentation to view what it described as the difference in the product and a new procedure for application. The new product was represented as a replacement for Fourt's Red Line specifically. One Fourt customer wrote that it had received the new product from Michael Tucker, which shows that Tucker had placed the competing product with one of Fourt's existing customers almost immediately after leaving Fourt.

12

46. On or about June 17, 2026, a meeting was arranged for Tucker and TEAM Innovative Solutions to work with Marcor Industrial and Davidson Sales and Engineering, a long-standing Fourt customer, so that Marcor would stock and promote TEAM's competing coatings, with Tucker described as the person who had developed Fourt's coatings. This solicitation post-dates Fourt's cease-and-desist letters (described below) and reflects the ongoing nature of the conduct.

47. Defendants developed and brought competing wear and lining products to market within a span far too short to be explained by legitimate independent development, particularly for chemically formulated products of this kind. The speed with which Defendants produced a functional replacement for Fourt's flagship line shows that Defendants relied on Fourt's products and confidential information, including by providing Fourt's products to a developer of similar products to be copied, rather than developing their own.

48. Defendants have used and disclosed, and threaten to continue using and disclosing, Fourt's formulations, manufacturing and application processes, customer information, and pricing in order to compete for and divert Fourt's customers.

**G.     Fourt Has Lost Customers and Goodwill**

49. Defendants' conduct has caused Fourt to lose customers and goodwill. For example, Frontline notified Fourt in writing that it would no longer purchase from Fourt, citing changes in administration.

50. As another example, ICBS informed Fourt that it had received and was purchasing Michael Tucker's products, and that, while it remained willing to review new products Fourt developed, it intended to replace Fourt's conveyor belt repair line, the Fourthane Red Line, with Tucker's products.

51.     These losses follow directly from Defendants' solicitation of Fourt's customers and their marketing of copycat products, and Fourt remains at risk of further losses, including in the Florida territory that Evans serviced. Defendants would not have been able to successfully solicit the customers they took without using Fourt's Trade Secrets. The harm to Fourt's customer relationships and goodwill is ongoing and cannot be fully remedied by money damages.

**H.     Notice and Defendants' Response**

52.     Fourt, through prior counsel, sent cease and desist letters to Tucker, Martin, and Evans. Copies are attached as Composite **Exhibit "C."** Counsel for Tucker and TEAM Innovative Solutions responded and denied that Tucker had signed any restrictive covenant, a denial that is directly contradicted by the Tucker Agreement. A copy is attached as **Exhibit "D."** Thus, Tucker appears to have lied to his attorney about the existence of the Tucker Agreement. After receiving Fourt's cease and desist letter, Tucker edited the description on his LinkedIn profile.

**COUNT I**
**VIOLATION OF THE DEFEND TRADE SECRETS ACT, 18 U.S.C. § 1836**
*(by Plaintiffs against all Defendants)*

53.     Plaintiffs reallege and incorporate by reference the allegations of paragraphs 1-52 as though fully set forth herein.

54.     The Trade Secrets are trade secrets within the meaning of 18 U.S.C. § 1839(3). The information derives independent economic value from not being generally known or readily ascertainable through proper means, and Fourt has taken reasonable measures to keep the information secret.

55.     The Trade Secrets relate to products and services used in, and intended for use in, interstate and foreign commerce.

14

56. Plaintiffs own the Trade Secrets. Fourthane owns the technical Trade Secrets, including the formulations, manufacturing processes, and know-how, and FIS owns the United States commercial Trade Secrets, including customer information and pricing. Together, Plaintiffs own all of the Trade Secrets at issue.

57. Defendants misappropriated the Trade Secrets within the meaning of 18 U.S.C. § 1839(5) by, among other things, acquiring them through improper means and by using and disclosing them without consent, including by disclosing Fourt's Trade Secrets to IIG (which unlawfully acquired them) and others, by arranging to ship Fourt's finished products to a developer of similar polymer products identified as Forsch Polymer Corporation to develop copies or backup products, and by using Fourt's Trade Secrets to develop and market competing products and to solicit Fourt's customers. Defendants knew or had reason to know that the Trade Secrets were acquired by improper means or under circumstances giving rise to a duty to maintain their secrecy.

58. Defendants' misappropriation was willful and malicious, including because Tucker and Martin organized a competing company while still employed by Fourt, used Fourt's confidential information for the benefit of that company, arranged to ship Fourt's products to a developer of similar products and then deleted the record of that shipment, and acted to conceal their other competing activities, which entitles Plaintiffs to exemplary damages and attorneys' fees under 18 U.S.C. 1836(b)(3)(C) and (D).

59. As a direct and proximate result of Defendants' misappropriation, Fourt has suffered, and will continue to suffer, damages, including actual loss and Defendants' unjust enrichment, and Fourt has suffered and will continue to suffer irreparable harm for which there is no adequate remedy at law.

## COUNT II
### VIOLATION OF THE FLORIDA UNIFORM TRADE SECRETS ACT, FLA. STAT. §§ 688.001 TO 688.009
*(by Plaintiffs against all Defendants)*

60.     Plaintiffs reallege and incorporate by reference the allegations of paragraphs 1-52 as though fully set forth herein.

61.     The Trade Secrets are trade secrets within the meaning of Fla. Stat. § 688.002. The information derives independent economic value from not being generally known or readily ascertainable through proper means, and Fourt has taken reasonable measures to keep the information secret.

62.     Defendants misappropriated the Trade Secrets within the meaning of Fla. Stat. § 688.002 by among other things, acquiring them through improper means and by using and disclosing them without consent, including by disclosing Fourt's Trade Secrets to IIG (which unlawfully acquired them) and others, by arranging to ship Fourt's finished products to a developer of similar polymer products identified as Forsch Polymer Corporation to develop copies or backup products, and by using Fourt's Trade Secrets to develop and market competing products and to solicit Fourt's customers. Defendants knew or had reason to know that the Trade Secrets were acquired by improper means or under circumstances giving rise to a duty to maintain their secrecy.

63.     Defendants' misappropriation was willful and malicious, entitling Plaintiffs to exemplary damages and attorneys' fees under Fla. Stat. §§ 688.004(2) and 688.005.

64.     As a direct and proximate result of Defendants' misappropriation, Fourt has suffered damages, including actual loss and Defendants' unjust enrichment, or in the alternative a reasonable royalty, and Fourt has suffered and will continue to suffer irreparable harm for which there is no adequate remedy at law.

16

## COUNT III
## BREACH OF CONTRACT, THE TUCKER AGREEMENT
*(by FIS against Tucker)*

65.     Plaintiffs reallege and incorporate by reference the allegations of paragraphs 1-52 as though fully set forth herein.

66.     The Tucker Agreement is a valid and enforceable written contract signed by Tucker.

67.     The Tucker Agreement is supported by one or more legitimate business interests within the meaning of Fla. Stat. § 542.335, including Fourt's Trade Secrets, its valuable confidential business information, its substantial relationships with specific existing and prospective customers, and the goodwill associated with its business. The restraints are reasonably necessary to protect those interests.

68.     Tucker breached the Tucker Agreement by soliciting Fourt's customers within one year of the end of his employment, by inducing or attempting to induce Fourt employees to leave Fourt, and by disclosing and using Fourt's confidential information.

69.     As a direct and proximate result of Tucker's breaches, Fourt has suffered damages and irreparable harm for which there is no adequate remedy at law, and Fourt is entitled to injunctive relief and damages.

## COUNT IV
## BREACH OF CONTRACT, THE EVANS AGREEMENT
*(by FIS against Evans)*

70.     Plaintiffs reallege and incorporate by reference the allegations of paragraphs 1-52 as though fully set forth herein.

71.     The Evans Agreement is a valid and enforceable written contract signed by Evans.

72.     The Evans Agreement is supported by one or more legitimate business interests within the meaning of Fla. Stat. § 542.335, including Fourt's Trade Secrets, its valuable

confidential business information, its substantial relationships with specific existing and prospective customers, and the goodwill associated with its business. The restraints are reasonably necessary to protect those interests.

73.     Evans breached the Evans Agreement by competing with Fourt during the restricted period, by soliciting Fourt's customers and suppliers, and by using and disclosing Fourt's confidential information, including by receiving a Fourt customer list at his personal email account.

74.     As a direct and proximate result of Evans's breaches, Fourt has suffered damages and irreparable harm, and Fourt is entitled to injunctive relief and damages.

<u>**COUNT V**</u>
**BREACH OF FIDUCIARY DUTY**
*(by FIS against Tucker)*

75.     Plaintiffs reallege and incorporate by reference the allegations of paragraphs 1-52 as though fully set forth herein.

76.     As an employee who held a position of trust and confidence, Tucker owed FIS a duty of loyalty and a fiduciary duty.

77.     Tucker  breached his duty by engaging in disloyal conduct while still employed, including more than simply organizing a competing company while still employed or planning and preparing to compete, including by using FIS's confidential information, arranging to ship FIS's finished products to a developer of similar polymer products identified as Forsch Polymer Corporation to develop copies or backup products, upon information and belief FIS's and attempting to divert FIS's business opportunities, upon information and belief soliciting FIS's customers and employees in anticipation of their departures, and removing or transmitting FIS's confidential information outside of Fourt's control.

78.     As a direct and proximate result of these breaches, FIS has suffered damages, and FIS is entitled to damages, disgorgement, and other relief.

## COUNT VI
## TORTIOUS INTERFERENCE WITH BUSINESS RELATIONSHIPS
*(by Plaintiffs against all Defendants)*

79.     Plaintiffs reallege and incorporate by reference the allegations of paragraphs 1-52 as though fully set forth herein.

80.     FIS has existing and prospective business relationships with its customers, including QBM, Davidson Sales and Engineering, Frontline, ICBS, and others, that afford FIS existing or prospective legal rights.

81.     Defendants knew of these business relationships, including because Tucker, Martin, and Evans developed and serviced these relationships during their employment with FIS.

82.     Defendants intentionally and without justification interfered with these relationships by improper means, including by using Fourt's misappropriated Trade Secrets, by breaching contractual and fiduciary duties owed to Fourt, and by soliciting Fourt's customers in violation of those duties.

83.     As a direct and proximate result of Defendants' interference, Fourt has suffered damages, including lost customers and lost sales.

## COUNT VII
## CIVIL CONSPIRACY
*(by Plaintiffs against all Defendants)*

84.     Plaintiffs reallege and incorporate by reference the allegations of paragraphs 1-52 as though fully set forth herein.

85.     Defendants agreed among themselves to commit unlawful acts, or lawful acts by unlawful means, against Fourt, including the breach of the fiduciary duties owed to Fourt and the tortious interference with Fourt's business relationships.

19

86.     Defendants committed overt acts in furtherance of the conspiracy, including the organization of a competing company in Georgia while Tucker and Martin were still employed and its registration in Arizona, the coordinated resignations in April and May 2026, the disclosure of Fourt's confidential customer information, and the solicitation of Fourt's customers with competing products.

87.     The conspiracy is predicated on independently actionable wrongs, including breach of fiduciary duty and tortious interference.

88.     As a direct and proximate result of the conspiracy, Fourt has suffered damages.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that the Court enter judgment in their favor and against Defendants, and grant the following relief:

(a) Preliminary and permanent injunctive relief enjoining Defendants from using or disclosing Fourt's Trade Secrets and confidential information, from violating their agreements, and from marketing or selling products developed through the misappropriation of Fourt's Trade Secrets;

(b) Actual damages, the amount of Defendants' unjust enrichment, or in the alternative a reasonable royalty;

(c) Exemplary damages under 18 U.S.C. § 1836(b)(3)(C) and Fla. Stat. § 688.004(2);

(d) Disgorgement and forfeiture of compensation paid to Tucker, Martin, and Evans during their periods of disloyalty;

(e) Attorneys' fees and costs under 18 U.S.C. § 1836(b)(3)(D), Fla. Stat. §§ 688.005 and 542.335, and any applicable contract that provides for attorneys' fees;

(f) Costs of suit;

(g) Pre- and post-judgment interest; and

(h) Such other and further relief as the Court deems just and proper.

20

## <u>DEMAND FOR JURY TRIAL</u>

Plaintiffs demand a trial by jury on all issues so triable.

Dated: July 16, 2026

                                        Respectfully submitted,

                                        MELAND BUDWICK, P.A.
                                        *Counsel for Plaintiffs*
                                        3200 Southeast Financial Center
                                        200 South Biscayne Boulevard
                                        Miami, Florida 33131
                                        Telephone: (305) 358-6363

                                        By: */s/ Eric W. Ostroff*
                                        Eric W. Ostroff, Esq.
                                        Florida Bar No. 10130
                                        eostroff@melandbudwick.com
                                        Will J. Rosenzweig, Esq.
                                        Florida Bar No. 1075685
                                        wrosenzweig@melandbudwick.com

21